UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SPECIALTY MEDICAL EQUIPMENT, INC.,

    Plaintiff,

v.

                                                  Case No. 25-cv-10664
                                                  HON. MARK A. GOLDSMITH

MARK DOBRONSKI,

    Defendant.

_____/

**<u>OPINION & ORDER DENYING DEFENDANT'S MOTION TO DISMISS (Dkt. 8)</u>**

This case involves Plaintiff Specialty Medical Equipment, Inc.'s claims against Defendant Mark Dobronski for state law fraud and for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) (RICO). Am. Compl. (Dkt. 6).

Before the Court is Dobronski's motion to dismiss Specialty Medical's amended complaint under Federal Rule of Civil Procedure 12(b)(6).[1] Mot. (Dkt. 8). For the reasons stated below, the Court denies the motion.

## I.    BACKGROUND

Specialty Medical is a durable medical equipment (DME) provider and supplier. Am. Compl. ¶ 9. It serves patients who often rely on Medicare or other insurance. Id. Specialty Medical regularly responds to inquiries from prospective patients, verifies their medical and

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion to dismiss, the briefing includes Specialty Medical's response (Dkt. 9) and Dobronski's reply brief (Dkt. 10).

insurance information, and arranges for shipment of necessary medical equipment to patients' homes. Id.

Specialty Medical alleges that its business "depends on truthful information from patients and healthcare providers," meaning that if an individual calls Specialty Medical seeking supplies and provides medical details, "those details [should be] accurate and genuine." Id. at ¶ 10. It further alleges that "[f]alse information can lead to improper billing to Medicare or insurers, wasted shipments, regulatory compliance issues, and other serious problems." Id.

Dobronski is an individual, believed to be living in Florida. Id. at ¶ 30. Dobronski is also associated with an enterprise called Safe Train, LLC, a Florida limited liability company, which is not a party to this litigation but is relevant to the claims. Id. at ¶ 55. Dobronski is not a customer of Specialty Medical. Id. at ¶ 31.

The amended complaint alleges that Dobronski is a "serial plaintiff" who "frequently pursues claims against businesses, including healthcare providers, under the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. (TCPA). Am. Compl. at ¶ 2. Specialty Medical alleges that Dobronski has "evolved his claim-seeking scheme" by adopting false names and identities for the purpose of encouraging call-backs from businesses to telephone numbers that Dobronski has registered under the National "Do Not Call" Registry.[2] Id. at ¶¶ 3–4. Dobronski then pursues TCPA claims against those companies. Id. at ¶¶ 2, 5.

---

[2] The National Do Not Call Registry website is www.donotcall.gov. The Federal Trade Commission (FTC) designed the registry to "stop unwanted sales calls[.]" See Federal Trade Commission Consumer Advice, National Do Not Call Registry FAQ, located at: https://perma.cc/DNT4-6WJV. The registry is a "list that tells registered telemarketers what numbers not to call[.]" Companies that illegally call numbers on the National Do Not Call Registry or place an illegal robocall "can currently be fined up to $50,120 per call." Id.

2

On February 3, 2025, Dobronski, using an alias, called Specialty Medical and the call was routed to a call center. Id. ¶¶ 11–12. Specialty Medical alleges that Dobronski provided it with a false name and with a false Medicare identification number. Id. at ¶ 13. He "spun an entirely false narrative that he was a legitimate patient in need of diabetes and sleep apnea supplies." Id. at ¶ 14. This false narrative, Specialty Medical alleges, was so convincing and thorough in its details, that Specialty Medical's staff did not doubt the legitimacy of the call. Id.

During that call, Dobronski requested that Specialty Medical provide him with DME. Id. He invited Specialty Medical to communicate with him via telephone and provided a real Michigan-based call-back number. Id. at ¶ 15. He also provided Specialty Medical with a real street address in Dexter, Michigan for a property that Dobronski and his wife own. Id. at ¶¶ 16, 37. He gave Specialty Medical the name of a physician who was ostensibly his treating doctor. Id. at ¶ 17.

The following day, on February 4, 2025, Dobronski called Specialty Medical again and verified the false information for his alias. Id. at ¶ 18. The Specialty Medical representative who took the call told Dobronski that he needed an updated prescription for certain supplies. Id. at ¶ 19. Soon thereafter, Specialty Medical discovered that Dobronski had provided it with a false Medicare identification number. Id. at ¶ 20. Specialty Medical called the call-back number that Dobronski had provided to "clarify this issue and issues related to physician orders." Id. at ¶¶ 21, 22. It left messages for Dobronski's alias at that Michigan-based number. Id. at ¶ 21.

Dobronski called Specialty Medical back from a new Florida-based phone number owned by Safe Train, LLC. Id. at ¶ 23. Dobronski revealed his true identity and informed Specialty Medical that the Michigan-based call-back number it used on February 4 was registered on the Do Not Call Registry. Id. at ¶¶ 25–27. Specialty Medical alleges that "the voice on this subsequent

3

call was the same as that in the initial calls in which the Alias was provided by Mr. Dobronski, while previously posing as the Fake Patient." Id. at ¶ 26.

Specialty Medical alleges that Dobronski's conduct was "a deliberate and malicious fraud," in which he "pose[d] as a patient" and "intended to trick" Specialty Medical into calling him back for Dobronski's personal gain. Id. at ¶ 28. Specialty Medical seeks to hold Dobronski responsible for its time, resources, and costs wasted, as well as punitive damages and injunctive relief to prevent Dobronski "from engaging in such fraudulent schemes in the future." Id. at ¶ 29.

For his part, Dobronski argues that Specialty Medical's "business model thrives on intrusive robocalls to seniors[.]" Mot. at PageID.86. He characterizes this case as a "retaliatory" lawsuit to "punish" Dobronski for "documenting" Specialty Medical's "systemic violations" of the TCPA, and a "brazen attempt to weaponize federal RICO and fraud statutes to silence a private citizen exercising congressionally granted rights." Id. at PageID.85. While Dobronski admits that he gave Specialty Medical "false personal details," he argues that (i) he did so only after Specialty Medical initiated an unsolicited call to Dobronski, and (ii) he offered these details both to identify Specialty Medical and to "protect himself" from its "deceptive telemarketing practices." Id. at PageID.88.

## II. ANALYSIS

Specialty Medical brought two counts against Dobronski: (i) state-law fraud; and (ii) civil RICO violations. Am. Compl. at PageID.69–77. Dobronski filed his motion under Federal Rule of Civil Procedure 12(b)(6), arguing that Specialty Medical failed to state a claim against him.[3]

---

[3] To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). The plausibility standard requires courts to accept the alleged facts as true and to make all reasonable inferences in favor of the plaintiff. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In his motion, Dobronski argues that the Court should dismiss Specialty Medical's state law fraud claim because it fails to establish the element of justifiable and cognizable reliance. Mot. at PageID.90–96. He also argues that the Court should dismiss Specialty Medical's civil RICO claim because Specialty Medical has failed to plausibly allege (i) the enterprise; (ii) a viable predicate act of wire fraud; and (iii) a pattern of racketeering activity. Id. at PageID.96–102. Lastly, Dobronski argues that the Court should dismiss Specialty Medical's RICO claims because his activity is protected by the Noerr-Pennington doctrine. Id. at PageID.102–103. For the reasons explained below, the Court rejects Dobronski's arguments and denies his motion to dismiss.

### A. State Law Fraud Claim—Justifiable Reliance

Under Michigan law, a plaintiff asserting a claim of common-law fraud must prove the following elements:

> (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

Titan Ins. Co. v. Hyten, 817 N.W.2d 562, 567–568 (Mich. 2012).[4] Federal Rule of Civil Procedure 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake." The Sixth Circuit has explained that Rule 9(b) "require[es] plaintiffs to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent

---

[4] Although the briefing does not address why Michigan law applies, the Court accepts the parties' apparent agreement that Michigan law applies. See Mot. at PageID.93 (citing elements of Michigan fraud claim); Resp. at PageID.154 (stating that the parties agree on the elements of fraud under Michigan law). Specialty Medical is a Michigan corporation with its principal place of business in Michigan. Am. Compl. at PageID.67. "Michigan choice of law provisions favor allowing Michigan residents to bring suit in Michigan courts under Michigan law. . . . Generally speaking, a tort claim filed in a Michigan court will be governed by Michigan law unless a rational reason exists to displace it." Gass v. Marriott Hotel Servs., Inc., 558 F.3d 419, 425 (6th Cir. 2009) (punctuation modified).

scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." Bennett v. MIS Corp., 607 F.3d 1076, 1100 (6th Cir. 2010).

Dobronski argues that Specialty Medical fails to state a fraud claim against him because it has failed to establish the fifth element—reliance. Mot. at PageID.91. Dobronski makes three assertions in support of this argument: (i) reasonable or justifiable reliance must be plead in the complaint; (ii) Specialty Medical's legal verification obligations preclude it from establishing reliance; and (iii) this case should be dismissed because it is a misuse of litigation, as illustrated by Mey v. Pintas, 734 F. Supp. 3d 515 (N.D. W.Va. 2024).[5] None of his arguments has merit.

### 1. Establishing Reasonable or Justifiable Reliance in a Complaint

Dobronski first argues that the complaint is insufficient because Specialty Medical failed to establish reasonable or justifiable reliance. Mot. at PageID.90–93. It is true that Michigan courts require that a claimant must ultimately demonstrate reasonable reliance to prevail on a fraud claim. See Cooper v. Auto Club Ins. Ass'n, 751 N.W.2d 443, 451–452 (Mich. 2008) (stating that a fraud claimant must demonstrate reasonable reliance to prevail). But Dobronski has not supplied a case holding that Michigan law requires a fraud claimant to allege in the complaint that its reliance was reasonable; nor has the Court located any such case. In fact, caselaw suggests that there is no such requirement at the pleading stage. See In re Pixley, 456 B.R. 770, 780 (Bankr. E.D. Mich. 2011) ("Many Michigan cases stated the elements of fraud in a way that included actual reliance, but did not expressly require that the actual reliance be reasonable or justifiable.").

The cases cited by Dobronski were not decided at the pleading stage. See, e.g., Nieves v. Bell Ind., Inc., 517 N.W.2d 235, 238 (Mich. App. 1994) (reversing summary judgment for plaintiff where the evidence demonstrated that the plaintiff "had information available to him that he chose

---

[5] The third assertion is not a reliance argument, but it is grouped here because Dobronski included it in his briefing under the heading of reliance.

to ignore," and thus his reliance on the misrepresentation was unreasonable); Zaremba Equip. Inc. v. Harco Nat'l Ins., Co., 761 N.W.2d 151, 165 (Mich. App. 2008) (reversing a trial verdict for plaintiff because the plaintiff could not have reasonably relied on representations that ran counter to a clear and unambiguous insurance policy that plaintiff admitted it had received).

In any case, as explained below, the complaint sets forth sufficient allegations of reasonable reliance.

### 2. Reliance and Regulatory Verification Obligations

Dobronski also argues that Specialty Medical has not alleged justifiable reliance because Specialty Medical is subject to independent verification obligations. He argues that Medicare requires companies such as Specialty Medical to independently verify a potential customer's eligibility—and not simply rely on patient-provided information—before dispensing DME or supplies.[6] Id. at PageID.91. The upshot of this is that Specialty Medical had a duty to pursue a verification process that ultimately would have led it to discover the truth about Dobronski before it took any actions—such as shipping products or otherwise changing its position—based on the alleged misrepresentations. Id. at PageID.92.

However, Dobronski ignores what Specialty Medical claims it did in reliance on the alleged misrepresentations. It alleges that, based on Dobronski's phone calls, it believed that Dobronski "wished to form a relationship with [Specialty Medical] for the supply of DME." Am. Compl. at ¶ 37(g). Because of this inducement, it "incurred expense in pursuing the set-up of a DME supply relationship with [Dobronski]." Id. at ¶ 44. Similarly, it suffered "humiliation and embarrassment due to pursuing communications with third parties, including an alleged treating physician . . . which has caused harm to [Specialty Medical's] professional reputation." Id. at ¶¶ 45–46.

---

[6] The applicable law, he explains, is set forth in 42 C.F.R. § 410.38(d)(1) and the Medicare Program Integrity Manual at Chapter 5. Mot. at PageID.91.

7

In other words, Specialty Medical alleges injury and expense incurred as a result of relying on Dobronski's solicitation for products he never intended to purchase. Because these costs were incurred by virtue of Dobronski's initial sham contact, a later verification process would neither prevent nor undo all of that injury. Those allegations are sufficient to allege reliance for purposes of Rule 9(b).[7]

### 3. Misuse of Litigation

The Court also rejects Dobronski's argument that Specialty Medical's fraud claim is dubious because "federal courts explicitly recognize and protect private litigants" such as Dobronski, when they engage in activities in support of enforcement actions that deter abusive telemarketing practices. Mot. at PageID.95. Dobronski cites to Mey v. Pintas, 734 F. Supp. 3d 515, for the proposition that the TCPA "encourages" individuals to engage in TCPA enforcement, and that it "strongly condemned the misuse of litigation tactics—such as bringing retaliatory or vexatious lawsuits designed to intimidate or silence consumer advocates—as fundamentally antithetical to the TCPA's intended protected framework." Id.

Mey has no application here. The Mey court enjoined a telemarketer— which believed it might be sued by an individual for TCPA violations—from proceeding with a retaliatory suit the telemarketer had brought against that individual in Puerto Rico. While the court condemned the

---

[7] As part of his briefing on reliance, Dobronski also frames the issue as one of "conclusory and speculative" claims of damages that are not connected to the alleged misrepresentations. Mot. at PageID.94. But what has been said regarding reliance is true regarding damages: Specialty Medical has asserted concrete harm allegedly flowing from the initial fraudulent conduct. Such damage allegations are plausible at the pleading stage. See DPR Mgmt., LLC v. Evanston Ins. Co., No. 11-14600, 2012 WL 368335, at *2 (E.D. Mich. Feb. 3, 2012) ("[P]laintiffs do not need a full accounting of their loss to survive a 12(b)(6) motion.") (punctuation modified); see Twombly, 550 U.S. at 556 (explaining that the plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].").

telemarketer's litigation tactics, its decision to enjoin the telemarketer from proceeding with its suit was based on a lack of personal or subject matter jurisdiction by the Puerto Rico court. Whether Specialty Medical has engaged in inappropriate tactics has not yet been established; and there is no contention here of personal or subject matter jurisdiction infirmities. The Mey decision is irrelevant here. The Court, therefore, rejects Dobronski's arguments under Mey.

Because none of Dobronski's attacks on the state law fraud claim withstands analysis at the pleading stage, his motion to dismiss Specialty Medical's fraud claim is denied.

### B. RICO Claim

The RICO statute requires that a plaintiff plead the following: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). Dobronski argues that the Court should dismiss Specialty Medical's RICO claim because it has failed to allege an "enterprise," has failed to allege the predicate acts of wire fraud, and has failed to allege a pattern of racketeering. Id. at PageID.96–102. The Court rejects these arguments.

#### 1. Enterprise

Dobronski argues that Specialty Medical has failed to set forth an "enterprise" under the RICO statute. To establish liability under 18 U.S.C. § 1962(c), a plaintiff must "allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). An "enterprise" under § 1962(c) requires that a plaintiff allege: "(1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties; and (3) that the enterprise was separate and distinct from the pattern of racketeering activity

in which it engaged." Ouwinga v. Benistar 419 Plan Servs., Inc., 694 F.3d 783, 793 (6th Cir. 2012). Courts construe "enterprise" liberally to effectuate RICO's remedial purpose. Id. at 794.

Dobronski argues that Specialty Medical's allegations that he acted "in concert with his wife and utilized the communications equipment of their LLC, Safe Train . . . are vague, conclusory, and fall short of this standard." Mot at PageID.97. More specifically, he argues that Specialty Medical "fails entirely to articulate any distinct organizational structure, specific roles performed by Mrs. Dobronski or Safe Train within an enterprise context, or any operational hierarchy or coordinated decision-making process independent from Dobronski's own alleged actions." Id.; see Reply at PageID.170. He also argues that Specialty Medical has not alleged any facts "suggesting Safe Train or Mrs. Dobronski functioned as part of an ongoing, structured criminal organization separate from their ordinary familial or business relationship with Dobronski." Id.

The Court rejects Dobronski's argument. Specialty Medical has adequately alleged an association-in-fact "enterprise" between Dobronski and Safe Train consistent with Boyle v. United States, 556 U.S. 938, 946 (2009). In Boyle, the Supreme Court identified the three elements of an association-in-fact enterprise: "[a]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. (punctuation modified).

As to the purpose element of an "enterprise," a plaintiff must plead that the enterprise is "a continuing unit that functions with a common purpose." Id. at 948. Specialty Medical alleges that Dobronski's purpose in conducting the activity of his enterprise is to bring TCPA enforcement claims against entities that he believes violate the TCPA. Specialty Medical alleges that Dobronski

10

does so "[b]y adopting false names and entities" and "fabricating scenarios to provoke calls or interactions with companies and then suing those companies for financial gain." Am. Compl. at ¶¶ 4–5, 31. The Court finds these allegations sufficient to satisfy the purpose element of an enterprise.

As to the second enterprise element, relationships, the Supreme Court states that the structural relationships need not be hierarchical; rather, the enterprise can make decisions on an ad hoc basis, does not need a formal name, and does not require members to have fixed roles. See Boyle, 556 U.S. at 948.

The Court rejects Dobronski's argument that Specialty Medical was required to "articulate [a] distinct organizational structure" or "specific roles," which Boyle clearly rejects. Mot. at PageID.97. Specialty Medical alleges that Dobronski is an individual and associated with Safe Train, LLC as its sole owner, manager, member, and registered agent. Am. Compl. at ¶¶ 23, 52–57. Specialty Medical also alleges that Dobronski acts in concert with his wife and uses telephone and communications equipment that is utilized by Safe Train and Mrs. Dobronski. Id. at ¶¶ 53–54. These allegations are sufficient for alleging relationships of an enterprise.

Dobronski does not specifically challenge the adequacy of the "longevity" requirement in the amended complaint. But the allegations relative to longevity here are plausible when compared to other cases addressing that requirement. In Ouwinga, 694 F.3d at 794–795, the Sixth Circuit found that the plaintiff adequately alleged longevity when it alleged that the enterprise "functioned at least five years." The "affairs" of the enterprise must be "of sufficient duration to permit an associate to participate in those affairs through a pattern of racketeering activity." Boyle, 556 U.S. at 946 (punctuation modified).

11

Specialty Medical has alleged that Dobronski's fraudulent purpose of using false identities to gather information for TCPA claims has functioned for at least five years. The amended complaint cites Dobronski v. Total Insurance Brokers, LLC, No. 21-10035 Am. Compl., ¶ 63 (E.D. Mich. March 1, 2021) and Dobronski v. Family First Life, LLC, No. 22-12039 Am. Compl., ¶¶ 99–101 (E.D. Mich. Feb. 22, 2023) as two instances where Dobronski has filed complaints containing admissions that he has used a false identity to gather information for TCPA claims. See Am. Compl., ¶ 62. Those cases— filed in 2021 and 2022— together with the instant case amount to an allegation of wrongful activity that spans at least five years. That is sufficient to demonstrate longevity.

Dobronski argues that Specialty Medical's complaint "improperly conflates the alleged enterprise with Dobronski's individual conduct and his immediate family/business structure." Mot. at PageID.98. He cites Jacovetti Law, P.C. v. Shelton, No. 20-00163, 2020 WL 5211034 (E.D. Penn. Sept. 1, 2020) in support of this argument. In Jacovetti, the plaintiffs pursued a RICO claim against an individual, Shelton, arguing that Shelton "has turned the private right of action under the TCPA into a business." Jacovetti, 2020 WL 5211034 at *1. The court rejected the argument that the complaint in that case alleged "racketeering activity," finding that "litigation conduct does not constitute a scheme or artifice to defraud…absent corrupt activity." Id. at *3. Unlike the plaintiff in Jacovetti, who did not allege any other "corrupt activity," Specialty Medical has alleged that Dobronski initiated the phone call and provided false information to fabricate a scenario by which he could later bring a TCPA claim against Specialty Medical.

In sum, Specialty Medical has alleged the existence of an enterprise with sufficient detail to satisfy the requirements of an enterprise under § 1962(c).

### 2.     Predicate Act of Wire Fraud

Dobronski argues that Specialty Medical failed to plead a "predicate act" of wire fraud with the required specificity under Rule 9(b) and, instead, has only presented "generalized conclusions and lack of the granular detail." Mot. at PageID.98–100. Wire fraud claims require a plaintiff to allege (i) a scheme or artifice to defraud; (ii) use of interstate wire communications in furtherance of the scheme; and (iii) intent to deprive a victim of money or property. Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393, 404 (6th Cir. 2012).

Additionally, when pleading wire fraud, "in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. In other words, the claims must be plead with attention to who, what, where, why, and how the scheme occurred.

Dobronski's argument that Specialty Medical has made insufficiently specific allegations of wire fraud fails. The amended complaint alleges the following specific details explaining the scheme and the use of interstate wire communications in furtherance of the scheme:

- Dobronski initiated contact with Specialty Medical on or around February 3, 2025. Am. Compl ¶ 11.
- Dobronski's call from a Florida telephone number was received at a call center located in the State of Texas. Id. at ¶ 12.
- In the phone call, Dobronski gave detailed "false answers about his health status, equipment use, [and] insurance details." Id. at ¶ 13.
- Dobronski gave Specialty Medical a real Michigan-based call-back number that was registered to Dobronski. Id. at ¶ 15.
- Dobronski called Specialty Medical again the following day, on February 4, 2025. Id. at ¶ 18.
- Later, Dobronski called Specialty Medical again from a "new, Florida-based phone number," registered to Safe Train. Id. at ¶ 23.
- During that call, Dobronski revealed that he had been using an alias, and complained that his call-back number was registered on the Do Not Call list. Id. at ¶ 27.

13

This sufficiently explains the who, what, where, why, and how the scheme occurred and satisfies Rule 9(b).

The Court also rejects Dobronski's argument that the required element of wire fraud setting forth the "intent to deprive a victim of money or property" is not alleged in Specialty Medical's complaint. See Mot. at PageID.100. Specifically, he argues that his intent was not to deceive Specialty Medical into parting with its money or property through fraud, but rather to "document potential TCPA violations for subsequent litigation." Mot. at PageID.100. Dobronski again relies on Jacovetti. Id.

There, the Court stated "litigation conduct does not constitute a scheme or artifice to defraud because absent corrupt activity like bribing witnesses or parties, litigation conduct does not constitute a scheme or artifice to defraud for purposes of a civil RICO case." Jacovetti, 2020 WL 5211034, at *3. Dobronski's argument fails because, unlike the plaintiff in Jacovetti, Specialty Medical here has alleged that Dobronski's conduct goes beyond mere "litigation conduct" and instead used false or fraudulent information designed to deceive Specialty Medical. Specifically, Specialty Medical alleged in its amended complaint that it was deprived of money, as it "incurred expense in pursuing the set-up of a DME supply relationship with [Dobronski]" Am. Compl. at ¶ 44. The Court finds that Specialty Medical has satisfied the requirement that it plead that Dobronski's scheme was carried out with the intent to deprive it of money or property.

In sum, Specialty Medical's allegations satisfy the predicate act specificity requirements under Rule 9(b) because it explains the who, what, where, why, and how, underlying the alleged predicate act of wire fraud.

**C.    Pattern**

Dobronski argues that Specialty Medical failed to allege a "pattern of racketeering activity" as required under the RICO statute. Mot. at PageID.101–102. To show a pattern of racketeering activity, a plaintiff asserting a RICO violation must establish that the defendant committed "at least two 'predicate acts' of racketeering activity within ten years of each other." Vemco, Inc. v. Camardella, 23 F.3d 129, 133 (6th Cir. 1994). The Supreme Court in Boyle explained that "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce." Boyle, 556 U.S. at 947 (punctuation modified).

Dobronski argues that his interactions with Specialty Medical are "a discrete series of interactions," which "occur[ed] over a short period (February 2025)" which fail to establish the continuity required for a pattern under RICO. Mot. at PageID.101. Dobronski relies on Vemco, which rejected finding a pattern because the plaintiff did not plead sufficient acts to constitute a pattern. Vemco, 23 F.3d at 133.

Vemco, however, is different from the instant case. It involved a dispute over a building project. Id. at 132. After it became apparent to the plaintiff that the project would not meet the required specifications for the agreed upon cost or be operational within the agreed upon time, the plaintiff filed a RICO claim against the defendant, arguing that the defendant allegedly schemed to misrepresent a guaranteed price and later extort a higher price. Id. at PageID.132. The Court found that the allegations of a "pattern" were insufficient. Id. The "total scheme," it explained, was a "seventeen-month" dispute over a "single criminal episode" involving "one building project," which were not enough. Id. Dobronski attempts to characterize the events here as "isolated" and "short term," similar to the single insufficient event in Vemco.

15

Dobronski's reliance on Vemco and his efforts to characterize the events underlying the lawsuit as "discrete" ignore the fact that Specialty Medical has cited two of Dobronski's TCPA cases in the last ten years where he has admitted to using a false identity to gather information for a potential TCPA claim.  See Am. Compl. ¶ 62.  These two instances, in addition to the incident underlying this case, are sufficient to satisfy the "pattern" of activity allegation requirement.

The Court also rejects Dobronski's argument, under Jacovetti, that Specialty Medical cannot establish a pattern on the theory that Jacovetti recognizes that "being a frequent or 'serial' TCPA litigant does not transform lawful petitioning activity into a pattern of criminal racketeering."[8]  Mot. at PageID.101.  Again, his citation to Jacovetti is misplaced because it did not involve allegations of fraud.  In sum, Specialty Medical has adequately plead a pattern under RICO.

### D.   Noerr-Pennington Doctrine

Lastly, Dobronski argues that Specialty Medical's RICO claims "must be dismissed because they target conduct protected by the First Amendment under the Noerr-Pennington doctrine."  Mot. at PageID.102–103.  The right "to petition the Government for a redress of grievances" is protected by the First Amendment of the United States Constitution.  U.S. Const. amend. I.  "The Noerr–Pennington doctrine, based on the right to seek redress in the courts, provides that a party "may not be subjected to liability for its attempt to have its rights protected by the courts unless that attempt is shown to have been a mere 'sham.'"  Melea Ltd. v. Quality Models Ltd., 345 F. Supp. 2d 743, 758 (E.D. Mich. 2004).

---

[8] Dobronski also cites to a case Mey v. Peninsula Communications, but the citation he gives (444 F. Supp.3d 853) is for a different case, Ctr. for Biological Diversity v. U.S. Forest Serv., 444 F. Supp. 3d 832, 853 (S.D. Ohio 2020).  Because the Court cannot locate Mey v. Peninsula Communications it cannot analyze its potential application.

16

Dobronski argues that Noerr-Pennington bars Specialty Medical's RICO litigation against him because his conduct—investigating potential TCPA violations, making "do not call" demands, and pursuing litigation—falls squarely within the type of activity Noerr-Pennington protects. Mot. at PageID.103. He argues that the only way for Specialty Medical to overcome Noerr-Pennington protection is to show, under the sham exception, that Dobronski's "activity was objectively baseless." Id.

Specialty Medical cites Hartman v. Great Seneca Fin. Corp., 569 F.3d 606, 615 (6th Cir. 2009) in support of its position. Hartman involved a dispute over whether a debt collector attached a legitimate account statement to its debt collection complaint. The debtor alleged that the account statement was not legitimate, and the debt collector argued that Noerr-Pennington immunized it against claims that the account statement was illegitimate. The Sixth Circuit found that Noerr-Pennington did not protect the debt collector because the debtor alleged the account statement was intentionally deceptive. Id. at 616. Specialty Medical seeks to have this Court apply the same logic here—that its claims of intentional fraudulent misrepresentation overcome any protection otherwise afforded to Dobronski under the Noerr-Pennington doctrine.

The Court agrees. Dobronski's invocation of Noerr-Pennington ignores the fact that Specialty Medical alleges that Dobronski's goal in his TCPA litigation is not "merely to seek redress under the TCPA," but rather, "to invite those calls under false pretenses and later claim that he was not the one making the invitation." Id. at PageID.164. Specialty Medical's allegations here—that Dobronski used a false name, provided false medical information, and engaged in a scheme to defraud— are sufficient to overcome any possible application of Noerr-Pennington.

### III. CONCLUSION

For the reasons explained above, the Court denies Dobronski's motion to dismiss (Dkt. 8).

17

SO ORDERED.

Dated: February 26, 2026                           s/Mark A. Goldsmith  
Detroit, Michigan                                 MARK A. GOLDSMITH  
                                                         United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 26, 2026.

                                                         s/Joseph Heacox  
                                                         JOSEPH HEACOX  
                                                         Case Manager